MARY VAUGHAN, The (GORDON v.). See Case No. 5,618.

## Case No. 9,229.

### The MARY WASHINGTON.

[1 Abb. U. S. 1;[1] Chase, 125; 5 Am. Law Reg. (U. S.) 692.]

Circuit Court, D. Maryland. April Term, 1865.

CARRIERS—DELIVERY—NOTICE OF ARRIVAL — OPPORTUNITY TO REMOVE—CUSTOM—INJURY—DAMAGES —AFFREIGHTMENT — ADMIRALTY JURISDICTION.

1. The duty of a common carrier by water is not fulfilled by simple transportation from port to port. The goods must be delivered; or at least landed, and a reasonable opportunity given to the consignee to inspect them.

[Cited in The City of Lincoln, 25 Fed. 839; Constable v. National Steamship Co., 154 U. S. 51, 14 Sup. Ct. 1074.]

[Cited in Barker v. The E. M. Wright, 1 Mackey, 24.]

2. The general rule requires the carrier to notify the consignee of the arrival of the goods. If a carrier relies on circumstances as excusing this duty, he must prove them.

[Cited in The Boskenna Bay, 22 Fed. 665.]

3. To show that the carrier was accustomed to store goods in his warehouse, on their arrival, and let them remain there until the consignee should learn from the consignor that they had come, without showing that the consignor knew of and assented to this practice, is not enough to excuse the carrier from the duty of giving notice himself to the consignee. He will continue liable as carrier, until the consignee has received, from some quarter, information of the arrival of the goods and an opportunity to remove them.

4. The fact that after receiving such notice the consignee refuses to take the goods, cannot relieve the carrier from liability for injury sustained by them before that time.

5. The courts of the United States have not jurisdiction of actions against warehousemen, as such, prosecuted between citizens of the same state.

6. The fact that a contract of affreightment is to be performed wholly between ports within the same state, does not exclude it from the admiralty jurisdiction of the courts of the United States. The admiralty jurisdiction conferred by the constitution upon these courts, extends to all contracts of a maritime character to be performed upon navigable waters.

[Cited in The Belfast v. Boon, 7 Wall. (74 U. S.) 642; The Leonard, Case No. 8,256; Re Long Island, etc., Transp. Co., 5 Fed. 607; U. S. v. Burlington & Henderson County Ferry Co., 21 Fed. 336.]

7. A carrier transported goods to the port of delivery, and then, without notifying the consignee that they had come, stored them in his warehouse; where they were injured before the consignee knew of their arrival. *Held*: (1) That the carrier was liable as such, and not as warehouseman only; in the absence of affirmative proof of some facts excusing him from the duty of giving notice. (2) That, as the contract was for transportation over navigable waters, the consignor might proceed for damages, in the district court, in admiralty; notwithstanding the port of shipment and the port of delivery were both in the same state.

[Appeal from the district court of the United States for the district of Maryland.]

The libel in this cause was filed by Ayres and others against the owners of the Mary Washington, to recover damages for their

------

[1] [Reported by Benjamin Vaughan Abbott. Esq., and by Bradley T. Johnson, Esq., and here compiled and reprinted by permission.]

failure to deliver in good order merchandise entrusted to them for transportation. It appeared by the evidence on the hearing in the district court, that the respondents below undertook, in consideration of a specified freight to be paid by the libelants, to transport the merchandise in question from Baltimore to a place called "Hill's Landing," on the Patuxent river, to be delivered to one Pumphrey. The respondents were in business as common carriers between these points. The goods reached Hill's Landing in safety; and, there, were landed from the steamboat, the Mary Washington. The consignee, Pumphrey, was not present to receive them; and they were placed in a warehouse occupied by the respondents, and connected with their wharf. While remaining there stored, the goods received the injuries for which this suit was brought. The respondents were accustomed, in the regular course of their business, to deposit goods arriving at Hill's Landing, which could not for any reason be immediately delivered, in the warehouse above mentioned, for safe keeping until delivery should be made. No additional charge was made for such storage; it was regarded as an incident to the carriage, and as paid for in the freight. It did not appear that any notice of the arrival of the goods was given to Pumphrey. Upon the above facts, the district court gave judgment for the libelants [case unreported], from which the owners of the steamboat now appealed.

P. W. Crain and William M. Addison, for appellants.

William Pinkney Whyte, for respondents.

CHASE, Circuit Justice. Under the circumstances of this case, I think that the contract of affreightment bound the carriers not only to carry the merchandise to the landing, but to deliver it to Pumphrey, or excuse non-delivery by proof of equivalent action or waiver. The duty of a carrier by water is not fulfilled by simple transportation from port to port. The goods must be delivered, or at least landed, and a reasonable opportunity given to the consignee of ascertaining their condition. In order that opportunity for inspection and for the removal of the goods may be given, the consignee must be notified of the arrival of the goods. This is the general rule. If exceptions are made by usage, circumstances, or special arrangements, they must be shown by proof.

In the present case, the respondents allege that it was not their practice to give notice to consignees, but instead of giving such notice, to deposit goods in their warehouse, where the consignees were expected to call for them, on learning from their correspondents, or otherwise, of their arrival. They insist that this arrangement was for the benefit of the owners of the goods, and was understood and agreed to by them. The evidence does not sustain this claim. It shows, clearly enough, the practice of the respondents; but it does not show any understanding, on the part of the owners of the goods, that the respondents were to be relieved from their responsibility as carriers until actual delivery of them, or an equivalent deposit in their warehouse, with information conveyed to the owners in some way that their goods had arrived. The warehouse arrangement was rather for the convenience of the carriers than of freighters or consignees. The storage, with information of arrival, however obtained, may be regarded properly enough as a substitute for actual and direct notice; and it may be admitted that opportunity for removal, after such information, would discharge the carriers from responsibility as such, in the same manner as actual notice and the like opportunity. But to hold that mere deposit in their own warehouse, under the circumstances of this case, terminated their special responsibility, would be a dangerous relaxation of the salutary rule on which the security of commerce so largely depends.

It is clear, from the proof, that the merchandise was damaged after the landing, and while in the custody of respondents, before Pumphrey had information of its arrival, or opportunity to take it away. It seems, however, that the merchandise was not ordered from the libelants by Pumphrey, and that he declined to receive it; and it is alleged that the carriers, therefore, were not liable. And there was proof that no order for the merchandise was actually given, and that Pumphrey, on learning its condition, refused to have any thing to do with it. But it is not easy to perceive the importance of this circumstance. It is plain enough that the libelants acted in good faith upon an expectation founded on a conversation with Pumphrey, that he would like to have the merchandise sent to him, and that he would receive and pay for it, if of good quality and in good condition, and the proofs show that this expectation was warranted. Whether warranted or not, the duty of the carriers was in no way affected. Their obligation, both to shippers and consignees, was to convey and deliver (or at least offer to deliver) safely. It is true that after Pumphrey had information of arrival, and declined to receive the merchandise because of its bad condition, the respondents could not be held responsible as carriers, to the libelants, for subsequent injuries in the warehouse; but their responsibility for prior injuries was not changed, and it is that responsibility only which is now in controversy.

In the present case, the question whether the respondents were liable as common carriers or as warehousemen is of little importance, except as a question of jurisdiction. The proof shows a degree of negligence which would make them liable in either character. But if their liability were as warehousemen only, they would not be

responsible in this court. A court of the Union has in general no jurisdiction of suits against warehousemen by citizens of the same state. Remedies for violation of these contracts must be sought by their co-citizens in state courts.

It is not questioned, however, that the judicial power of the United States extends to all cases of admiralty and maritime jurisdiction. This is a provision of the national constitution. Nor is it questioned that this whole jurisdiction is vested by law in the district courts of the United States, and, on appeal, in the circuit courts. This was expressly enacted by congress, in 1789 [1 Stat. 73]. Nor is it questioned that a contract of affreightment, to be performed by traversing tide waters, or other navigable waters, is in general a maritime contract, or that a suit upon such a contract makes a case of admiralty jurisdiction. This is settled by repeated decisions. But it is insisted that the contract of affreightment in this case was to be performed wholly within the state of Maryland, and that this case, therefore, having arisen from an alleged breach of it, is not within the admiralty jurisdiction. Upon this I remark, in the first place, that there is nothing in the nature or history of admiralty jurisdiction which excludes from its cognizance contracts to be performed within the country or state in which it is exercised. On the contrary, such contracts, if maritime in their character, were constantly held, before the organization of the Union, to be proper subjects of that jurisdiction.

Within a comparatively recent period, however, doubts have been expressed whether such contracts can be enforced by national courts sitting in admiralty. Such doubts were expressed, in 1848, by Justice Nelson, speaking for a majority of the justices of the supreme court of the United States in the case of New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 392. They were founded on the assumption that "the exclusive jurisdiction in admiralty cases was conferred on the national government as closely connected with the grant of commercial power," and were cautiously stated as follows: "It is a maritime court, instituted for the purpose of administering the law of the seas. There seems to be ground, therefore, for restraining its jurisdiction, in some measure, within the limits of the commercial power, which would confine it, in cases of contracts, to those concerning the navigation and trade of the country upon the high seas and tide waters with foreign countries, and among the several states. Contracts growing out of the purely internal commerce of the state, as well as commerce beyond tide waters, are generally domestic in their origin and operation, and could scarcely have been intended to be drawn within the cognizance of the federal courts."

The principle thus intimated rather than asserted was applied, ten years later, in the case of Allen v. Newberry, 21 How. [62 U. S.] 244, to a contract of affreightment to be performed on Lake Michigan, between two ports in Wisconsin; but the decision against the jurisdiction over the contract was placed quite as much upon the act of congress of February 26, 1845 [5 Stat. 726], which restricts admiralty jurisdiction on the lakes and interior navigable waters to contracts relating to vessels employed between ports in the different states,—as upon the more general restriction derived from the limitation of the commercial power.

It cannot escape observation that this denial of jurisdiction to the national courts of affreightment contracts to be performed between ports of the same state, but on navigable waters, where, in cases of tort, the admiralty jurisdiction is undoubted, rests wholly upon the assumption that the restriction upon the commercial power operates as a constitutional limitation of the jurisdiction in admiralty over contracts.

Now, without more than a reference to the difficulty of assigning a reason for such a limitation of that jurisdiction in matters of contract which would not require the like limitation in matters of tort, and to the admitted doctrine that in matters of tort no such limitation exists, it is proper to observe that it has been more than once distinctly denied by the supreme court that any inference whatever in respect to the jurisdiction in admiralty can be drawn from the constitutional provision concerning commerce. Thus in the case of The Genesee Chief, 12 How. [53 U. S.] 452, the late chief justice, speaking for the court, and speaking with special reference to admiralty jurisdiction, said: "Nor can the jurisdiction of the courts of the United States be made to depend on regulations of commerce. They are entirely distinct things, having no necessary connection with one another, and are conferred in the constitution by separate and distinct grants."

So, too, in the case of The Propeller Commerce, 1 Black [66 U. S.] 578, in 1861; the supreme court, noticing an objection to its jurisdiction on the ground that it did not appear that the propeller was engaged in foreign commerce, or in commerce between the states, and speaking through Justice Clifford, said: "Admiralty jurisdiction was conferred upon the government of the United States by the constitution, and in cases of tort is wholly unaffected by the considerations suggested in the proposition."

This is the latest judgment of the supreme court; and unless it can be shown that jurisdiction in matters of contract is not as "wholly unaffected by the considerations" referred to, as jurisdiction in matters of tort, it seems to be my duty, being fully satisfied that this court has jurisdiction, under the constitution and the law, over the con-

tract of the respondents, to award to the libellants that justice to which the proofs clearly entitle them, without turning them out of this and requiring them to resort to another court. I do not think this can be shown, and therefore affirm the decree of the district court. Decree affirmed.